UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | 4:14-CR-40120-KES |
| Plaintiff, | |
| vs. | REPORT AND RECOMMENDATION |
| RICHARD PAUL OLSON JR., | |
| Defendant. | |

**INTRODUCTION**

Defendant Richard Paul Olson, Jr. is before the court on a superseding indictment charging him with two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(d).  See Docket No. 26. Mr. Olson has now filed a motion seeking to suppress the .22 revolver and ammunition seized by police which form the basis of count one.[1]  See Docket No. 38.  The government resists the motion.  See Docket No. 41.  Mr. Olson's motion was referred to this magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Schreier's Standing Order dated October 16, 2014. The following is this court's recommended disposition of the motion.

**FACTS**

An evidentiary hearing was held in this matter on January 22, 2015. Mr. Olson and his counsel, Assistant Federal Public Defender Timothy Langley,

---

[1] No motion to suppress is made as to the .380 caliber handgun which forms the basis of count two of the superseding indictment.

were present.  The government was represented by its Assistant United States Attorney Jennifer Mammenga.  At the hearing, three witnesses testified: Deputy United States Marshal Gary Bunt, Detective Craig Butler of the Minnehaha County Sheriff's Office, and Sergeant Joe Bosman, also from the Minnehaha County Sheriff's Office.  In addition, five photographs were introduced into evidence.  From this evidence the court makes the following findings of fact.

Prior to December 12, 2013, there were state felony warrants outstanding for the arrest of Mr. Olson.  The Sioux Falls Area Fugitive Task Force, of which all three witnesses were members, had been actively seeking to locate Mr. Olson for a period of several weeks.  The task force believed that Mr. Olson was not living regularly in any one location, but was moving around between four or five different locations in an attempt to elude arrest.  One of the locations he was thought to frequent was a trailer park in Sioux Falls near the intersection of Tenth and Franklin Streets.  Another such location was 700 West Bailey Street in Sioux Falls.

On December 12, 2013, Deputy Bunt was surveilling the trailer park mentioned above.  It had just snowed and the streets were slippery.  Law enforcement did not know of a specific trailer within the park that Mr. Olson was associated with, so Deputy Bunt was watching traffic coming and going to the entire park, hoping to spot Mr. Olson or his vehicle.  Deputy Bunt recognized Mr. Olson's vehicle leaving the park and began following him, contacting other law enforcement to tell them of these facts.  When a state

officer attempted to affect a traffic stop on Mr. Olson's vehicle a short time later, Mr. Olson's vehicle accelerated at a high rate of speed.  A high-speed chase ensued (high speed for the road conditions), which was eventually called off after Mr. Olson's vehicle ran a red traffic light at the intersection of Sixth Street and West Avenue.

The next day, on December 13, 2013, a Sioux Falls policeman conducted a traffic stop on a vehicle containing persons who were known to associate with Mr. Olson.  The stop occurred near the intersection of West Madison Street and and North Kiwanis Avenue.  One of the occupants in the vehicle was Luke Poor Thunder, who lived at 700 West Bailey Street.  Poor Thunder told the police that Mr. Olson had spent the night at Poor Thunder's house the night before and that Olson was still at the house when Poor Thunder left the house that day.  Poor Thunder also told police that he had observed Mr. Olson in possession of a .22 caliber handgun at his house the night before.  The police officer conveyed this information to other members of the Fugitive Task Force, two of which were Deputy Bunt and his partner, Deputy United States Marshal Ken Markie.

Deputies Bunt and Markie traveled to 700 West Bailey Street.  Upon their arrival in the vicinity, they spotted Mr. Olson standing on the corner of Bailey and North Prairie Street, walking toward the deputies' van.[2]  Mr. Olson appeared to recognize the deputies as law enforcement as he immediately did

---

[2] The deputies testified they were driving a 2013 Dodge Grand Caravan, a passenger van.  No testimony indicates whether the van was marked as a law enforcement vehicle.

an about-face and began walking in the opposite direction.  When the officers first spotted Mr. Olson, they were approximately one and one-half property lots away from him.  As the officers drew nearer to verify Mr. Olson's identity, they confirmed that it was indeed Mr. Olson.

At this point, Mr. Olson ran directly toward the residence at 700 West Bailey.  Deputy Bunt yelled out to him "Stop! Police!"  Mr. Olson kept running away from the officers.

Deputies Bunt and Markie parked their van in the middle of the street and fled it, leaving the doors open and the engine running as they gave chase to Mr. Olson.  Deputy Bunt did not grab his police radio as he exited.  The officers followed Mr. Olson as he entered the front door of 700 West Bailey, slamming the door behind him.  The officers entered and followed Olson to a bedroom in the northeast corner of the house.  Mr. Olson slammed the door to the bedroom behind him as he entered the room.  Deputy Bunt kicked the door to the bedroom open as he followed after Mr. Olson.

Upon opening the door, Deputy Bunt observed Mr. Olson hunched over, facing away from Deputy Bunt.  When Bunt entered, Mr. Olson sprang back, throwing himself on the bed inside the room and shouting "Don't shoot me. Don't shoot me."  The officers observed three women who were also in the bedroom with Mr. Olson.  The two deputies then apprehended Mr. Olson.  In the midst of this, literally seconds after Mr. Olson was subdued, Deputy Bunt's phone rang.  He recognized the number displayed on his caller identification to be Detective Butler.  Deputy Bunt answered the call without giving Detective

Butler a chance to speak.  Instead, Deputy Bunt answered the call by stating "We have him.  You need to come right away," at which point Deputy Bunt hung up.

Deputy Bunt testified that he asked Detective Butler to assist them because he had concerns for officer safety.  Also, there were three women in the room, and he knew Detective Butler and Sergeant Bosman had been to 700 West Bailey before trying to find Mr. Olson, so he wanted them to come over to "see the situation."  In addition, Deputy Markie had begun pat searching Mr. Olson and discovering narcotics, for which Deputy Bunt testified neither he nor Markie were authorized to make arrests.

Deputy Markie placed Mr. Olson face-down on the floor of the bedroom and handcuffed him behind his back.  At this point, Deputy Bunt left to attend to the deputies' vehicle (i.e. park it properly, close the doors, secure weapons in the vehicle, and turn off the engine) and to retrieve his radio.  Deputy Markie was left to watch over Mr. Olson and the three women.  Deputy Bunt then returned to the northeast bedroom and rejoined Deputy Markie.  Deputy Markie conducted a pat-down search of Mr. Olson incident to his arrest. Found on Mr. Olson's person was a small jeweler's plastic baggie containing a white crystalline substance, three used syringes, $500 in cash, and a black Samsung cell phone.

Detective Butler and Sergeant Bosman arrived on the scene within three to five minutes of Detective Butler's phone contact with Deputy Bunt.  These two state officers had no idea where Deputy Bunt and his partner were,

whether they were chasing Mr. Olson outside somewhere or whether they were indoors.  Detective Butler called out for the deputies and Deputy Bunt, who had stationed himself on the threshold to the hallway where he could observe both the bedroom and the outside, answered from inside 700 West Bailey indicating where they were.  Detective Butler and Sergeant Bosman then followed the sound of the deputies' voices and entered the home, proceeding to the northeast bedroom.

Deputy Bunt never testified that he told Detective Butler on the phone that Olson was in handcuffs.  Detective Butler testified that he had no knowledge that Olson had been handcuffed already at the time he entered the home.  Sergeant Bosman testified that, upon arrival at 700 West Bailey, it was evident that the two Marshals "had their hands full" with trying to keep control over Mr. Olson and with the numerous people that were still unsecured and moving about the house.

Upon the entry of the state officers, the deputy marshals explained to them what had happened up to that point and showed the state officers the items that had been found by Deputy Markie's search of Mr. Olson's person. Detective Butler was standing next to a table that can be seen in Exhibits 1 and 2 from the hearing.  These exhibits depict a small wooden support topped by an oval piece of transparent glass.  See Exhibits 1 and 2.  The table has a small stereo and speaker, some ear buds, a tiny vase, and a pack of Marlboro cigarettes on it.  See Exhibit 1.  The table is approximately the same height as the nearby bed and approximately twelve inches away from the bed.  Id.

6

From his point of view, which is approximately the same angle of view as depicted in Exhibit 2, Detective Butler saw the barrel of a gun protruding from beneath a hat or glove on the floor between the glass table and the bed. Detective Butler testified that he saw the gun "right away" upon entering the room. The item was immediately recognizable to him as a gun barrel, Detective Butler testified, because he could see part of the cylinder of the revolver, he could see the gun sight on the end of the barrel, and the item was immediately adjacent to a box of .22 ammunition. The gun was positioned near Mr. Olson's feet as he lay on the floor, within Mr. Olson's "wingspan" according to Detective Butler. In the photo exhibits, the box of ammunition is parallel and immediately adjacent to the mop board; the tip of the gun barrel is nearly touching the ammunition box, and the gun barrel is perpendicular to the mop board. See Exhibits 1 and 2.

Detective Butler testified that, when he spotted the gun, no other officer was standing between Butler and his line of sight to the gun. Detective Butler testified that he identified the item as a gun without removing the clothing on top of it. Detective Butler testified that, although eventually the clothing on top of the gun was removed, he did not do it.

Neither of the Deputy United States Marshals had spied the gun during their time in the bedroom. Detective Butler spied the gun within one minute of arriving in the room.

As soon as Detective Butler saw the gun, he called out "Whose gun is this?" Mr. Olson replied, "It's mine." Mr. Olson was being helped to his feet by

7

the officers at the time Butler saw the gun.  Two other state officers arrived on the scene after Bosman and Butler had arrived.  No testimony established whether either of these officers entered the home or remained outside.  Upon questioning at the evidentiary hearing, Deputy Bunt agreed that it would have been "possible" to take Mr. Olson outside to meet up with Detective Butler and Sergeant Bosman as they arrived on the scene.

The state law enforcement officers stayed at the home and took photos of the evidence, field-tested the white substance in the jeweler's baggie, identified the other persons present in the home, ran warrants checks on them, and obtained statements of these persons.  After finishing these tasks, Mr. Olson was taken by one of the state officers to the Public Safety Building to be booked into the jail.  Deputy Bunt estimated that the total time which elapsed from the time he arrived on scene until the time Mr. Olson was transported downtown was approximately 20 minutes.

## DISCUSSION

Mr. Olson does not take issue with the entry into the house of the United States Marshals who pursued him into the house.  Their entry was justified because they had a felony arrest warrant for Mr. Olson and they were in hot pursuit of Olson, who fled into the house when he spotted the Marshals.  The focus of Mr. Olson's motion is the entry into the home of Detective Butler and Sergeant Bosman, who entered the house after the Marshals and who conducted a further search of the house, even though Mr. Olson had already been taken into custody and was handcuffed, laying face-down on the floor.

8

Mr. Olson makes two arguments in favor of suppression: (1) that the entry of Butler and Bosman into the home was a violation of the Fourth Amendment and (2) that the gun was not in plain view because it was not identified as a gun until the clothing partially obscuring the gun was removed.

The government argues that Mr. Olson's motion should be denied. The government posits that Mr. Olson had no reasonable expectation of privacy in the bedroom at 700 West Bailey Street. Further, the government asserts that the state officers' presence there was justified because the two deputies who arrived on the scene first were outnumbered, there was a possible gun in play in the situation, and the deputies requested assistance. Finally, the government argues that the plain view doctrine is an applicable exception to the warrant requirement in this case.

## A.    General Fourth Amendment Law

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures..." U.S. CONST. amend. IV. The home is at the very center of the privacy protections encompassed by the Fourth Amendment. Payton v. New York, 445 U.S. 573, 585-86 (1980). "Absent a valid exception to the warrant requirement, a warrantless search of a person's home presumptively violates the Fourth Amendment." United States v. Mendoza, 677 F.3d 822, 829 (8th Cir. 2012) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). If the government enters a home without a warrant, the burden is on the government to show by a

9

preponderance of the evidence that some exception to the warrant requirement applies.  United States v. Kennedy, 427 F.3d 1136, 1144 (8th Cir. 2005). "[E]xceptions to the warrant requirement are 'few in number and carefully delineated.' " Welsh v. Wisconsin, 466 U.S. 740, 749 (1984).

"[A] [felony] arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton, 445 U.S. at 602. However, a *warrantless* felony arrest in the home is prohibited absent exigent circumstances.  Welsh, 466 U.S. at 749.

One exception to the warrant requirement is the search incident to arrest.  "[A] lawful custodial arrest establishes authority to conduct a full search of the arrestee's person, and . . . such search is 'not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment' " United States v. Ball, 499 F.3d 890, 896 (8th Cir. 2007) (quoting United States v. Hrasky, 453 F.3d 1099, 1101 (8th Cir. 2006) (quoting United States v. Robinson, 414 U.S. 218, 235 (1973)).  The exception for searches incident to arrests is founded on the policy of ensuring officer safety and evidence preservation.  See Arizona v. Gant, 556 U.S. 332, 338 (2009).  Thus, a search incident to an arrest can include only "the arrestee's person and the area 'within his immediate control.' " Id. at 339 (quoting Chimel v. California, 395 U.S. 752, 763 (1969)).  This means the area that the arrestee can reach in order to gain possession of destructible evidence or a weapon.  Id.  This area-of-reach restriction ensures that the exception for

searches incident to arrest is commensurate with the purposes of the exception.  Id.  If the search extends into areas that the arrestee cannot reach, the exception for warrantless searches incident to arrest does not apply.  Id.  If the suspect has been handcuffed or otherwise secured/immobilized, then the search incident to arrest does not apply to searches that occur after that time. Id. at 343.

When officers enter a dwelling to execute a search warrant, they are permitted to conduct a protective sweep "when the officers' legitimate interest in assuring themselves the house in which the suspect has just been arrested is not harboring anyone who could pose a threat to officer safety 'is "sufficient to outweigh the intrusion such procedures may entail." ' "  United States v. Cantrell, 530 F.3d 684, 690 (8th Cir. 2008) (quoting United States v. Cash, 378 F.3d 745, 747 (8th Cir. 2004) (quoting Maryland v. Buie, 494 U.S. 325, 333-334 (1990))).  "The level of suspicion required for such a protective sweep is 'the same level of suspicion required for a stop and frisk under Terry v. Ohio, 392 U.S. 1 (1968)).' "  Cantrell, 530 F.3d at 690.  "Such a protective sweep requires ' " articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." ' "

## B.   Reasonable Expectation of Privacy/Standing

The government argues that, because Mr. Olson did not live at 700 West Bailey Street, he had no reasonable expectation of privacy.  Without a

reasonable expectation of privacy, the government argues, Mr. Olson has no standing to object to a search of those premises.

"Because [F]ourth [A]mendment rights are personal, a person challenging a search warrant must demonstrate that he or she has a legitimate expectation of privacy in the area searched . . . . By establishing a legitimate expectation of privacy the person establishes his or her standing to challenge the search." United States v. Wiley, 847 F.2d 480, 481 (8th Cir. 1988) (citing United States v. Nabors, 761 F.2d 465, 468 (8th Cir. 1985)).  A defendant challenging a search has the burden to establish "that he personally has an expectation of privacy in the place searched, and that his expectation of privacy is reasonable . . . ." Minnesota v. Carter, 525 U.S. 83, 88 (1998).  The challenger must prove that the expectation of privacy is subjectively reasonable and objectively reasonable, "that is, one that society is willing to accept." United States v. McCaster, 193 F.3d 930, 933 (1999).

"[I]n some circumstances a person may have a legitimate expectation of privacy in the house of someone else." Carter, 525 U.S. at 89.  For example, an overnight guest may have a legitimate expectation of privacy:  "From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside." Id. (citing Minnesota v. Olson, 495 U.S. 91, 98-99 (1990)).  Courts have distinguished between overnight guests and those merely visiting:  "an overnight guest in a home may claim the protection of the Fourth Amendment,

but one who is merely present with the consent of the householder may not."
Carter, 525 U.S. at 90.

When analyzing whether the defendant may claim a reasonable expectation of privacy in the home of another, courts should consider several relevant factors: "whether the party has a possessory interest in the things seized or the place searched; whether the party can exclude others from that place; whether the party took precautions to maintain the privacy; and whether the party had a key to the premises." McCaster, 193 F.3d at 933.

The testimony adduced at the hearing in this matter was that Mr. Olson had spent the night before at 700 West Bailey with the apparent permission of one of its lawful residents, Luke Poor Thunder. The testimony was further that Mr. Olson was still present at the home at the time Poor Thunder left the home on December 13, 2013. Testimony also established that Mr. Olson was a very short distance away from 700 West Bailey when Deputies Bunt and Markie spotted him. Upon being spotted, Mr. Olson fled back inside the home and slammed the front door behind him as well as the door to the bedroom when the deputies pursued him into the house. Also, Mr. Olson claimed ownership of the gun when Detective Butler questioned him. The court finds that Mr. Olson has satisfied his burden of showing that he had a reasonable expectation of privacy in the northeast bedroom and the item searched (the gun) sufficient to confer standing for purposes of challenging the search of that location.

13

**C.      Entry of Detective Butler and Sergeant Bosman Into the Home**

Mr. Olson concedes that, on the basis of the outstanding felony arrest warrant and on the basis of the deputies' hot pursuit of him, Deputies Bunt and Markie were allowed to enter the premises at 700 West Bailey to apprehend him.  However, within moments of entering the house, the deputies had apprehended him, handcuffed him, and searched his person.  At this point, the justification for the officers' entry into the home was complete. Mr. Olson argues that the deputies were not justified in calling in the assistance of other law enforcement officers and that those other officers— Butler and Bosman—had no Fourth Amendment privilege to enter the home. Since it was Detective Butler who found the gun, and since his presence inside the bedroom was not justified under the Fourth Amendment, Mr. Olson argues that the gun and ammunition found by Detective Butler must be suppressed. The burden is on the government to show that an exception to the warrant requirement allowed Detective Butler and Sergeant Bosman to enter the home.

In the case of United States v. Kaylor, 877 F.2d 658, 660, 664 (8th Cir. 1989), police entered Kaylor's home and arrested him in the basement.  After Kaylor had already been arrested, police conducted a protective sweep of the home because, among other reasons, they reasonably suspected Kaylor had a gun in the basement that some unseen third person could use against the officers.  Id.  Kaylor moved to suppress evidence that officers observed during the protective sweep.  Id.  The Eighth Circuit upheld the protective sweep on

14

the grounds that it was necessary and no more than necessary to ensure the officers' safety.  Id. at 664.

In United States v. Johnson, 12 F.3d 1103, *1 (8th Cir. 1993) (unpublished), the officers arrested Johnson on the porch of his sister's house when he answered their knock at the door.  After immobilizing Johnson and finding him unarmed, officers entered the house and conducted a protective sweep as they reasonably suspected he had a gun, which was as yet missing; the arrest would have alerted other persons in the house; and there was a possibility of an unseen person obtaining Johnson's gun and using it against the officers.  Id.  The Eighth Circuit approved the protective search under these facts.  Id.

In both Kaylor and Johnson, the protective sweep occurred after the suspect had been arrested and immobilized.  Similarly, in United States v. Standridge, 810 F.2d 1034, 1037-38 (11th Cir. 1987), cited approvingly by the Kaylor court, additional officers "rushed in" after the suspect had already been arrested and immobilized on a bed; the later-arriving officers conducted a protective sweep.  In denying Standridge's motion to suppress the evidence derived from the sweep, the Eleventh Circuit emphasized that even though the suspect had been arrested prior to the sweep, he was believed to have been armed and he had demonstrated his dangerousness by actively resisting his own arrest.  Id.  Under these circumstances, the officers reasonably feared for their own safety and the sweep was justified.  Id.

15

Mr. Olson relies on United States v. Erwin, 507 F.2d  937 (5th Cir. 1975), for his assertion that Detective Butler and Sergeant Bosman were not privileged under the Fourth Amendment to enter 700 West Bailey.  In the Erwin case, police had entered Erwin's apartment to execute an arrest warrant. Id. at 938.  Erwin and the only other occupant of the apartment were being held on a sofa in the living room under the supervision of two police officers. Id.  The officers conducted a protective sweep and verified that Erwin and his companion were the only occupants of the apartment.  Id.

At some point after the arrest, Erwin, unhandcuffed, went to the back bedroom to retrieve shoes and a shirt and police officer Brown accompanied him.  Id.  While in the bedroom, officer Brown saw and seized a pistol in plain view on the bedside table.  Id.  Officer Brown told the second officer, Collins, about finding the pistol when Erwin and Brown returned to the living room.  Id. Upon hearing this, officer Collins returned to the bedroom and searched, finding a shotgun on a shelf in the open closet.  Id.  Erwin moved to suppress the shotgun.  Id.

The Fifth Circuit cited the Chimel rule that a search incident to arrest extends only to those areas under the suspect's immediate control.  Id. Because Erwin was in the living room at the time of the search and he was under the supervision of officer Brown, the shotgun in the bedroom was not within Erwin's immediate control.  Id.  Therefore, the exception to the warrant requirement for searches incident to arrest did not apply.  Id.  In so holding the

16

court stated that "[officer] Collins knew there were no other persons in the apartment, so there would be no reasonable fear of anyone else using a weapon or destroying evidence." Id.  The court also rejected the plain view exception, stating that the second officer had no lawful reason to be in the bedroom at the time of the search.  Id.

Here, unlike the facts in Erwin, upon Detective Butler and Sergeant Bosman's arrival, there were multiple persons in the home.  The first two officers, Deputies Bunt and Markie, were outnumbered.  The officers knew that there may be a firearm in the home which had not yet been discovered.  And no one had yet completed a protective sweep of the home to ensure that the officers were aware of every person in the home.  Furthermore, although Mr. Olson was handcuffed and immobilized prior to Butler and Bosman's arrival, Butler and Bosman did not know that before they entered the home because Bunt had not communicated that fact to them yet.  Finally, Butler and Bosman entered the home because Deputy Bunt had requested their assistance.

Under these circumstances, Detective Butler and Sergeant Bosman did not violate the Fourth Amendment when they entered the home—Deputies Bunt and Markie had legitimate concerns for their safety as they had not located the weapon reportedly in Mr. Olson's possession, there were multiple persons in the home, and there may have been additional persons unknown to Bunt and Markie in the home at that point.  The fact that Mr. Olson had been immobilized and was face-down on the floor in handcuffs is not alone

17

determinative.  As in <u>Kaylor</u>, <u>Johnson</u>, and <u>Standridge</u>, <u>supra</u>, the fact that

Mr. Olson's weapon had not been located, the presence of multiple people in

the home, and the fact that the remainder of the home aside from the

northeast bedroom had not been explored was sufficient justification for a

protective sweep.  Bunt and Markie were in charge of Mr. Olson; it was

reasonable for them to ask other law enforcement officers to enter the home to

assist them.  Since their presence there was lawful, Detective Butler's spying of

the .22 revolver was within the plain view exception to the warrant requirement

as discussed in the next section of this opinion.

**D.      Whether the Gun Was In Plain View**

     Mr. Olson's final argument is that the gun was not in plain view and,

therefore, officers were not justified in seizing the gun under the plain view

doctrine.  Again, the burden is on the government to show that an exception to

the warrant requirement justifies the officers' actions.

     The limits of the plain view doctrine were explained in <u>Coolidge v. New</u>

<u>Hampshire</u>, 403 U.S. 443 (1971):

> [P]lain view alone is never enough to justify the warrantless seizure
> of evidence...no amount of probable cause can justify a warrantless
> search or seizure absent 'exigent circumstances.' Incontrovertible
> testimony of the senses that an incriminating object is on premises
> belonging to a criminal suspect may establish the fullest possible
> measure of probable cause.  But even where the object is
> contraband, this Court has repeatedly stated and enforced the
> basic rule that the police may not enter and make a warrantless
> seizure.

<u>Id.</u> at 468 (citations omitted).

The Court in Horton v. California, 496 U.S. 128 (1990), expanded upon the plain view doctrine.  The Horton Court stated that, because *any* evidence seized by the police will likely be in plain view, the plain-view doctrine may only be used to justify a warrantless seizure when the initial intrusion that brings the police within plain view of the items seized is supported by one of the recognized exceptions to the warrant requirement.  Id. at 135.  The plain-view doctrine does not stand alone, rather it works in conjunction with a prior justification for the lawful presence of the police at the place of the warrantless seizure.  Id. (citing Coolidge, 403 U.S. at 465-66).  That is, a police officer who comes across evidence while in hot pursuit of a fleeing suspect, while validly arresting a defendant, or while executing a valid search warrant for other objects may rely on the plain view doctrine to seize items in plain view that are not covered by a warrant.  Id. at 135-36 (citing Coolidge, 403 U.S. at 465-66).  Finally, if a police officer has some legitimate reason for being present that is *unconnected* with a search directed against the defendant, that is, an officer is not searching for evidence against the accused, then any incriminating objects in plain view may be seized without a warrant.  Id. at 135.

Mr. Olson relies on Arizona v. Hicks, 480 U.S. 321 (1987), for his argument that the plain view doctrine does not apply to the seizure of the .22 revolver in this case.  In Hicks, police entered Hicks' apartment following the discharge of a bullet through his apartment floor.  Id. at 323.  The officers' entry into the apartment to look for the shooter, other victims and weapons was justified by the exigent circumstances exception to the warrant

19

requirement.  Id.   While inside the rather "squalid" and "ill-appointed" apartment, police noticed expensive stereo equipment that seemed out of place. Id. at 323.  Although the officers reasonably suspected the equipment was stolen, they did not have probable cause to believe it.  Id. at 326.  An officer moved some of the components of the stereo system in order to record the serial numbers of the products, which he then called into headquarters.  Id. at 323.  The officer learned that the stereo equipment had been reported as stolen in an armed robbery, whereupon he seized the equipment.  Id.

The Supreme Court held that the moving of the stereo equipment by the officer constituted a search; though the recording of the serial numbers did not.  Id. at 324-25.  The question remaining was whether the search—moving the equipment in order to view the serial numbers—was reasonable.  Id. at 325.  Because the police did not have probable cause to believe the stereo equipment was stolen or contraband, the plain view doctrine did not support the seizure.  Id. at 326-27.

Mr. Olson relies on Detective Butler's written report of the events of December 13, 2013, which report was not admitted into evidence at the hearing but from which counsel cross-examined the detective.  In the report, Detective Butler wrote that he saw what "appeared to be" the barrel of a gun protruding from beneath a hat or glove on the floor of the bedroom.  From the detective's word choice—"appeared"—Mr. Olson argues that Detective Butler or one of the other law enforcement officers in the room must have removed the clothing that partially covered the gun in order to verify that it *was* in fact a

20

gun.  Mr. Olson argues this moving of the clothing, like the moving of the stereo in Hicks, was a search and was not, at the time it occurred (i.e. while the nature of the item underneath was still debatable), justified by the plain view doctrine because officers did not—at that point in time—have probable cause to believe the item was evidence of a crime or contraband.

If the evidence which was adduced at the hearing was more akin to Detective Butler's written report, Mr. Olson might have had a closer question. That is, if Detective Butler had testified that there was some doubt in his mind as to whether the object was a gun until after the clothing covering it was removed.  However, Detective Butler's testimony at the hearing was unequivocal and unwavering—he knew it was a gun from the moment he first saw it in its partially-covered state.  Furthermore, his testimony was quite specific and credible—even while the gun was partially covered, he saw part of the cylinder on the revolver, he saw the gun sight at the end of the barrel, and the gun was immediately adjacent to a box of .22 ammunition.  Lastly, Mr. Olson's status as a convicted felon would make his possession of a firearm a crime, and the gun itself evidence of a crime.  See 18 U.S.C. § 922(g)(1). Therefore, upon seeing the gun, Detective Butler had probable cause to believe it was evidence of a crime and, since it was in plain view, he had the right to seize the gun without a search warrant.  Horton, 496 U.S. at 135-36; Hicks, 480 U.S. at 326-27.

21

## CONCLUSION

This court respectfully recommends that defendant Richard Paul Olson Jr.'s motion to suppress [Docket No. 38] be denied in its entirety.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

DATED this 23rd day of January, 2015.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge